IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| CHRISTIAN CUTLER | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:11 cv 447 |
| | § | |
| STEPHEN F. AUSTIN STATE | § | JUDGE GILSTRAP |
| UNIVERSITY PRESIDENT BAKER | § | |
| PATTILLO, sued in his individual and | § | |
| official capacities, *et al.* | § | |
| | § | |
| | § | |
| Defendants | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 49)**

TO THE HONORABLE COURT:

Plaintiff responds in opposition to Defendants' Motion, with Brief, For Summary

Judgment (Dkt. 49, "Motion"), as follows:

**I
Introduction**

This is a First Amendment public employment case in which Plaintiff Christian

Cutler ("Cutler") contends the Defendants violated his free speech and association rights

when they terminated his employment for expressing his unfavorable impression of U. S.

Rep. Louie Gohmert while declining to "jury"[1] the Congressman's high school art

competition in Tyler, Texas.  Cutler had been the Director of Art Galleries at Stephen F.

Austin State University ("SFA"),[2] where his overall performance had always been

---

[1] Synonymous with "judging"

[2] *See Plaintiff's Exhibit A,* Cutler's job description

evaluated as "outstanding."  Cutler sues the  SFA administrators, individually and officially, who are responsible for and participated in the termination decision.

It is apparently undisputed that Rep. Gohmert had asked Cutler to do something, and that Cutler declined because of his poor impression of the Congressman.  A significant dispute, outcome determinative Defendants might argue, is whether Cutler declined a personal opportunity to jury the Congressman's art show in Tyler, or whether he declined a request for SFA to host the art show.

Defendants' Motion is larded down with highly disputed versions of alleged facts that are not relevant to the Defendants' summary judgment arguments in an apparent attempt to embarrass Cutler and to impugn his work performance.  The only issues Defendants' arguments raise regarding the violation of Cutler's right to freedom of speech are whether Cutler's speech involved a matter of public concern and whether Cutler's interest in commenting on matters of public concern are outweighed by the Defendants' interest in promoting efficiencies.  Motion at p. 14.   Defendants concede that they discharged Cutler on account of his speech.  Motion at p. 15.

Defendants argue that Defendants Robinson and Himes are not liable because they are not final decision makers.  As discussed below, the evidence and law show that Robinson and Himes are liable because of their involvement in the decision-making process that resulted in their terminating Cutler.

Defendants' Motion also argues that Defendants can avoid responsibility for violating Cutler's rights on the basis of qualified immunity because, as they argue in only conclusory terms, Cutler's right to free speech was not clearly established and not every

2

reasonable state university official would know that terminating Cutler for his speech would violate those rights.  As addressed herein, the law regarding the violation of Cutler's free speech rights was clearly established at the time Defendants fired Cutler and, as the Defendants have themselves conceded, they knew Cutler's speech was protected and to terminate him because of that speech would violate Cutler's rights.

## II
## Response to Statement of Issues ("Issues to be Decided")

Defendants' statements of "Issues to be Decided" are quite general.  *See* Defendants' Motion at p. 1.  Based on the arguments presented in Defendants' Motion, the issues appear to be:

 (1)  Whether Cutler's speech involved a matter of public concern;

 (2)  Whether Cutler's interest in commenting on matters of public concern outweighed the Defendants' interest in promoting efficiency;

 (3)  Whether Cutler has alleged a violation of constitutional right;

 (4)  Whether the right was clearly established; and

 (5)  Whether the Defendants' conduct in terminating Cutler under the circumstances of this case, and in light of the clearly established law, was objectively unreasonable.

## III
## Response to Defendants' Statement of Undisputed "Material Facts"

The "Material Facts' section of Defendants' Motion recites versions of events that are neither material to the summary judgment issues nor undisputed.  From page 2 through most of page 5 of Defendants' Motion, Defendants go to considerable effort to embarrass Cutler by impugning his work performance, as if they are arguing in their

3

summary judgment motion that alleged problems with Cutler's performance were their reasons for firing Cutler; in their motion they make no such argument, but instead concede that Cutler's speech was a substantial motivating factor in terminating Cutler. Motion at p. 14. The evidence shows that Defendants' aspersions cast at Cutler's performance are merely exaggerated recharacterizations of what had been considered, at most, minor events until Defendants sought to justify terminating Cutler to mollify Rep. Gohmert.

The evidence shows that, until learning of Rep. Gohmert's displeasure with Cutler in September 2010, Defendants had documented nothing but very positive views of Cutler's performance. *See Plaintiff's Exhibits 1 and 2*, Defendants' evaluations of Cutler for 2008 and 2009. Defendants evaluated Cutler's performance as:

> "Outstanding: Performance considerably exceeds expectations in all aspects of the job. This rating is reserved for those few individuals whose exceptional performance is obvious to all."

*Id.* (both evaluations). In Cutler's final evaluation his supervisor Defendant Robinson also wrote in summary:

> "Christian's role is critical to the future of the School of Art. Christian already has proven to be a skilled director. He brings a lot of talent to the job and consistently brings high caliber shows to SFA. His creativity in programming is simply brilliant. … His ability to work with visiting artists is phenomenal. Any rough edges are simply a matter of inexperience. In time, Christian will be an unstoppable force in expanding the reputation of the School of Art and the university. I anticipate a bright future for Christian and the SFA School of Art Galleries."

*Id.* (2009 Evaluation). It is absurd for Defendants to try to recharacterize Cutler's performance as negative after giving him such glowing evaluations.

## IV
## Facts[3]

A.  <u>Cutler's Protected Speech</u>

Cutler had never been contacted by anybody on behalf of Rep. Gohmert until August 2010 when a woman called, introduced herself as a member of Gohmert's staff, and asked Cutler if he'd be interested in traveling to Tyler to jury a high school art competition hosted by the Congressman.  *Plaintiff's Exhibit 3*, Cutler depo at pp. 60, l. 1 to 63, l. 18.  Cutler expressed his interest and asked for more information.  *Id.* at p. 62, l. 13-15.

Before getting any additional information from Rep. Gohmert's office, Cutler researched the Congressman on the Internet and saw video on YouTube in which Rep. Gohmert looked irrational  *Id.* at pp. 73, l. 6 to 75, l. 23.  Then, in September, Cutler for the second time spoke with the woman from Rep. Gohmert's office.  *Id.* at pp. 76, l. 1-17. During the second phone call, Cutler said he was not interested in jurying the art competition for Rep. Gohmert.  *Id.* at pp. 79, l. 12 to 80, l. 9.  When she asked why, he explained he did not want to associate with the Congressman.  *Id.*  When the member of Gohmert's staff wanted further explanation, Cutler said he had never said this kind of thing before, but he felt Rep. Gohmert was a fear monger and sensationalist with whom he (Cutler) did not want to associate himself.  *Id.*

Defendant Berry, speaking for himself and SFA, has testified he knew that Cutler had a right to express his opinions about Rep Gohmert and to say that he did not want

---

[3] The facts stated herein are supported by sufficient evidence to be relied on by the finder of fact, but are not necessarily undisputed.

associate with the Congressman.  *Plaintiff's Exhibit 4*, Berry I depo at p. 32, l. 11-21.[4]

Defendant Pattillo similarly testified that he knew Cutler had a First Amendment free

speech right to have, and speak, his less-than-favorable view of Rep. Gohmert, and that it

would be a violation of Cutler's First Amendment rights if he was fired for holding or

speaking his opinion of Rep. Gohmert.  *Plaintiff's Exhibit 5*, Pattillo depo at pp. 118, l. 14

to 122, l. 14.  Defendant Robinson also agreed that Cutler's impressions of Rep. Gohmert

are a matter of free speech.  *Plaintiff's Exhibit 6*, Robinson depo at pp. 96, l. 25 to 97, l.

5.

    B.  Rep. Gohmert's Reaction to Cutler's Protected Speech

On September 20, 2010, about ten days after Cutler's second phone call with Rep.

Gohmert's office, the Congressman wrote:

---

[4] There are three volumes of Defendant Berry's deposition transcripts, taken 09/21/12
(hereinafter, "Berry I"), 12/06/12 (hereinafter, "Berry II"), and 12/07/12 (hereinafter,
"Berry III").



### U.S. CONGRESSMAN LOUIE GOHMERT
*First District of Texas*

Christian Cutler
Director, SFA Art Galleries
SFA School of Art
Box 13001 SFA
Nacogdoches, Texas 75962-3001

Dear Mr. Cutler,

It was with sadness I received the news that you would not host the Congressional High School Art Competition this fall because you did not "want to be involved in any way" with me. The reason given was that you feel that I am a "fear monger."

To paraphrase the old adage, I disagree with what you say, am very sorry your sources of information are so limited in their views, but will defend to the death your right to be misinformed.

We have contacted Kilgore College and they are now quite thrilled to be hosting the event this year. It is such a wonderful opportunity for our talented high school students in east Texas and provides quality exposure for their abilities. It is also heightened attention that is brought to the college hosting the event, though it can be an inconvenience and require additional efforts that some would understandably prefer not to undertake. Obviously, the additional effort is not your issue; your issue is your complete disdain for me personally.

I apologize for my misunderstanding that your outstanding institution wished to be included in our efforts at providing students with exposure to different campuses around our east Texas district. We will not bother you in the future, even though I do hope to continue moving the host school from campus to campus in the years to come.  May God grant you peace that passes all understanding so that one day your bitterness and intolerance diminishes to the point that you are able to tolerate even someone like me.

Sincerely,

cc: Pres. Baker Pattillo

SFA000036

*Plaintiff's Exhibit 7*, Gohmert 2010 letter.  The letter is rather sarcastic and insulting to Cutler, ominously copied to Defendant and SFA President Baker Pattillo (the "cc" is circled), and, significantly, claims that Cutler had declined a request that SFA host the Congressman's art competition, as opposed to Cutler having declined an invitation to jury the competition in Tyler.  *Id.*; and *Exhibit 3*, Cutler depo at pp. 81, l. 13 to 83, l. 1.

From the letter Defendant Pattillo understood that Rep. Gohmert was angry, upset and concerned about Cutler's unfavorable view of him (Gohmert).  *Exhibit 5,* Pattillo depo at p. 118, l. 22-25.   Cutler was concerned that the Congressman was throwing his weight around and using the letter as a "fear tactic."  *Exhibit 6*, Robinson depo at p. 53, l. 1-10.[5]

C. Defendants' Response to Rep. Gohmert's Letter

As mentioned, when Defendant Pattillo got Rep. Gohmert's letter, he understood that the Congressman was angry, upset and concerned about Cutler's less-than-favorable view of Rep. Gohmert.  *Plaintiff's Exhibit 5*, Pattillo depo at pp. 118, l. 14 to 119, l. 1.

After Defendant President Pattillo received a copy of Rep. Gohmert's letter on the afternoon of September 20, 2010, the task of looking into the matter flowed bureaucratically downhill to Defendant Vice President and Provost Ric Berry, who transmitted the task to Defendant Dean of the College of Fine Arts Buddy Himes and then to Defendant Scott Robinson, Director of the School of Art and Cutler's direct

---

[5] It is Plaintiff's contention that the finder of fact can infer from the letter itself that Rep. Gohmert was trying to frighten Cutler by telegraphing to Defendant Pattillo that he wanted Cutler to be punished, if not fired.  The letter also introduces the dispute as to whether Cutler was asked to jury the Congressman's art competition in Tyler, or was asked if SFA would host the event.  Elsewhere, Rep. Gohmert "doth protest too much," to take a bit of Shakespeare's *Hamlet* out of context.  *See Plaintiff's Exhibit 7B*, Rep. Gohmert's email to SFA Regent Bob Garrett.

supervisor.  *Id.* at pp. 37, l. 20 to 38, l. 12;  *Plaintiff's Exhibit 4*, Berry I depo at pp. 10, l. 25 to 11, l. 9; *Plaintiff's Exhibit 6*, Robinson depo at p. 31, l. 6-22.

The gravity of Robinson's task was apparent; it was the only time Robinson could remember getting a call from Himes at home.  *Id.* at p. 38, l. 5-16.  It was clear Himes was unhappy about the letter from the Congressman.  *Id.* at pp. 38, l. 17 to 39, l. 5.  It was quite likely that Himes wanted action to be taken.  *Id.* at p. 40, l. 18-21.  From Himes' phone call Robinson understood that Cutler's job might be on the line.  *Id.* at  pp. 42, l. 25 to 43, l. 7.  Prior to that moment nobody had ever suggested that Cutler's job had been in jeopardy.  *Id.* at p. 43, l. 8-15.  Robinson called Cutler that evening to discuss the circumstances of Rep. Gohmert's letter.

 D. <u>Defendants Berry, Himes and Robinson Meet to Discuss Cutler's Response, and Reasons to Fire Cutler.</u>

The next morning, on September 21, 2010, Robinson met with Berry and Himes to discuss his phone call with Cutler.  *Id.* at p. 75, l. 17-21.  At that time Robinson was not aware of any reason to terminate Cutler, but because Pattillo, Berry and Himes were involved, "it was logical that a serious outcome was possible."  *Id.* at pp. 72, l. 10 to 75, l. 12.  Defendant Berry testified about the September 21, 2010 meeting and what his, and SFA's, understandings were based on the meeting with Himes and Robinson.

Their understandings included the following:  Cutler had explained that a month earlier he had received a call from Rep. Gohmert's staff asking if he would jury a high school art competition in Tyler, but later learned from Rep. Gohmert's letter received September 20, 2010 that the Congressman was claiming his office had been asking SFA to host his art show.  *Exhibit 4*, Berry I depo at pp. 24, l. 22 to 25, l. 6.  After the initial call Cutler had researched the Congressman and formed a poor impression of him, based

in part on YouTube videos of a House floor speech by Rep. Gohmert concerning "terror babies," and of a subsequent interview on CNN.  *Id.* at pp. 25, l. 12 to 26, l. 1; pp. 27, l. 20 to 28, l. 17.

Berry claimed that, as a result of this September 21, 2010 meeting, he and SFA were under the impression that Cutler had said that he (Cutler) knew that Rep. Gohmert's office had asked SFA to host the art show during the second phone call at the time Cutler declined the opportunity.  *Exhibit 4*, Berry I depo at pp. 28, l. 23 to 29, l. 13.[6]  It is Berry's and SFA's understanding that otherwise, on all other occasions, Cutler has consistently said that he only learned about Rep. Gohmert's claim that he was asking SFA to host the show from Gohmert's letter on September 20, 2010.  *Id.* at pp. 29, l. 25 to 31, l. 4.

It is apparent from Defendant Berry's notes from the September 21, 2010 meeting that they were formulating their explanation to terminate Cutler.  *Plaintiff's Exhibit 8.*  Along with a previously insignificant alleged "series of interpersonal problems," Berry was leaning toward characterizing Cutler's alleged "losing of the art show" as the "last straw" to justify Cutler's termination.  *Exhibit 4*, Berry I depo at pp. 89, l. 25 to 91, l. 14.[7]  At this point in time nobody from SFA and none of the individual defendants had talked to Cutler about this recharacterization of the alleged "interpersonal incidents" or their

---

[6] This testimony by Berry conflicted with his immediately preceding testimony that Cutler had not learned there was any notion of SFA hosting the event until receiving Rep. Gohmert's letter on September 20, 2010.

[7] An employer's efforts to justify a termination for allegedly cumulative problems that are not well substantiated can readily result in factual disputes that require a trial.  Laxton v. GAP, Inc., 333 F.3d 572, 580-83 (5th Cir. 2003).

claimed understanding that Cutler had known that he was refusing for SFA to host the Congressman's art show.

E. <u>Cutler's Ignored Efforts to be Heard</u>

On September 22, 2010 Cutler wrote an email to Defendants Pattillo, Himes and Berry, explaining that he had not heard of SFA possibly hosting the show until getting Rep. Gohmert's letter. *Plaintiff's Exhibit 9.* Defendant Himes had already been directed by Defendant Berry to fire Cutler at 4:30 on that afternoon, but the directive was cancelled. *See Plaintiff's Exhibit 10*, a transcript of that meeting ("Dean Himes Audio") at p. 2, l. 12-23.

On September 23, 2010 Cutler, seeing his position listed on the SFA Board of Regents meeting agenda without anybody talking to him about the Rep. Gohmert letter since Defendant Robinson on September 20, 2010, met with Defendant Himes, at Cutler's request. *Id.* Defendant Himes said there was a perception that Cutler, because Cutler's political views were not the same as Rep. Gohmert's, did not want the Congressman at SFA facilities that Cutler supervised. *Id.* at pp. 3, l. 3 to 4, l. 3. Cutler stated that there had been no mention of the art show being at SFA, that he was asked to be a juror for the exhibit in Tyler. *Id.* at p. 4, l. 6-7. Defendant Himes responded, "I don't think that's an issue." *Id.* at p. 4, l. 8-9. Cutler complained that no one was listening to him and the Congressman was throwing his weight around. *Id.* at p. 4, l. 23-25. Cutler said he felt railroaded, and Defendant Himes agreed. *Id.* at p. 5, l. 20-23. At deposition Himes explained:

13      Q.  What does that mean?  How did you understand
14   that he was being railroaded?

15          MR. TODD:  Object to the form.

16      A.  Normally when something like this would take
17   place, there would be some sort of investigation.

18      Q.  (BY MR. GARRIGAN)  Okay.

19      A.  And there wasn't any investigation per se.

20      Q.  Okay.  At that time -- I mean, did you know
21   that he was going to be terminated?

22      A.  That was the direction things seemed to be
23   headed in, yes.

24      Q.  And did you do anything to suggest, 'Hey, wait
25   a minute, we ought to investigate this first?'  Did you
 1   say anything like that to any of your colleagues?

 2      A.  Decisions are being made above my level.  It
 3   really wasn't my place to, and I wasn't asked to, no.

*Plaintiff's Exhibit 11*, Himes I depo[8] at pp. 53, l. 13 to 54, l. 3.  Defendant Himes was

fully aware of the important difference between Cutler's version and that relayed by

Robinson, consistent with Rep. Gohmert's letter, yet chose to not even question Cutler

about the difference.  *Id.* at pp. 41, l. 13 to 46, l. 23.  Himes chose to believe Rep.

Gohmert's version solely because he was a congressman and the stature of his office,

even though he had no knowledge of him, and chose to disbelieve Cutler with whom he

had worked and knew to be honest.  *Id.*

    Because Defendant Himes could not explain exactly why the Regents were going

to discuss Cutler's position, Cutler also met with Defendant Berry immediately after the

---

[8] There are three volumes of depositions of Defendant Himes, taken 09/21/12
(hereinafter, "Himes I"), 12/17/12 and 12/20/12 (hereinafter, "Himes II and III").

12

meeting with Himes.  *See Plaintiff's Exhibit 12*, a transcript of that meeting.  Defendant

Berry had seen Cutler's email.  *Id.* at p. 3, l. 5-7.  Cutler, for the first time, explained

directly to Defendant Berry what had happened and protested the perception that he had

his own political agenda for the SFA Galleries.  *Id.* at pp. 3, l. 8 to 7, l. 20.  Defendant

Berry did not contest whether Cutler was being asked to jury the art competition in Tyler

or not, but suggested that, no matter what, Cutler should have assumed he was only called

because of his job at SFA.  *Id.* at p. 8, l. 10-25.  Defendant Berry was apparently upset at

Defendant Robinson's description of Cutler's opinion of Rep. Gohmert.  *Id.* at p. 9, l. 11-

18.

> Defendant Berry went on to say:

> 18         Well, unfortunately we do have something to
> 19   do with him.  He's our congressman.  He helps us get
> 20   funding for things.  And it's just a good idea to not
> 21   throw those kinds of terms around when you deal with a
> 22   U.S. Congressman or a State representative.  I have
> 23   political issues with all of them.
>
> 24         MR. CUTLER:  Right.
>
> 25         DR. BERRY:  In private, I say things about
>
> 1   State officials that I would never say to their face.
> 2   Is it because I don't have any principles?  No.  It's
> 3   because I value what they might be able to do for us.
> 4   I'll go in that voting booth and vote the way I vote and
> 5   be very proud.
>
> 6         MR. CUTLER:  Right.
>
> 7         DR. BERRY:  I won't say things publicly
> 8   that I don't mean, but I won't say things publicly that
> 9   I'll say in private.

*Id.* at pp. 9, l. 18 to 10, l. 9.  Defendant Berry was essentially advising Cutler to keep his

political opinions private.  Defendant Berry also said of the whole situation:

13

9          DR. BERRY:  Really, this isn't about you,
10   Christian.  This is about our relationship with
11   Representative Gohmert right at this moment.

*Id.* at p. 11, l. 10-12.

During these conversations, neither Defendant Himes, nor Defendant Berry, made

any mention of the alleged "interpersonal incidents."

F.   The Roles of Defendants Himes and Robinson

Defendant Pattillo testified that Defendants Himes and Robinson were the ones

who talked to Cutler about whether he was invited to jury the Congressman's art contest

in Tyler or to host it at SFA.  *Plaintiff's Exhibit 5*, Pattillo depo at p. 116, l. 3-7.  Pattillo

counted on Defendants Berry, Himes and/or Robinson to have discussed that with Cutler

out of basic fairness.  *Id.* at pp. 117, l. 10 to 118, l. 8.  Defendant Berry, who reportedly

made the decision to fire Cutler, and SFA relied heavily on Defendant Robinson's

account of Cutler's response to Rep. Gohmert's letter.  *Exhibit 4*, Berry I depo at pp. 23,

l. 12 to 29, l. 24.  Berry and SFA relied on Robinson to corroborate Rep. Gohmert's

disputed version of events.  *Id.* at pp. 46, l. 15 to 47, l. 2.  Defendants Berry, Himes and

Robinson were meeting on 09/21/10 when the notion of a "series of interpersonal

problems" was discussed.  *Id.* at pp. 87, l. 1 to 88, l. 8.  Berry relied on Robinson's

opinion and fact finding that "helped" Berry to terminate Cutler.  *Plaintiff's Exhibit 13*,

Berry II depo at pp. 47, l. 11 to 48, l. 11; p. 49, l. 8-17.  Berry put Himes in charge of the

"investigation" into Rep. Gohmert's letter, although, as mentioned above, Himes said

there had been *no* investigation.  *Exhibit 4*, Berry I depo at pp. 8, l. 17 to 9, l. 1.

Defendant Himes told Cutler he was fired after discussing the matter with Defendant

Berry.  *Id.* at pp. 83, l. 17 to 84, l. 6.  Berry indicated that in addition to himself,

Defendants Pattillo, Himes and Robinson had roles in Cutler's termination and that Himes in particular gave him advice that lead Berry to recommend termination. *Exhibit 13*, Berry II depo at pp. 48, l. 23 to 49, l. 1.

G. The Termination Decision

Although Defendant Pattillo made the final decision to terminate Cutler, he said it was based solely on Defendant Berry's recommendation. *Exhibit 5*, Pattillo depo at p. 9, l. 4-17.  Without Berry's recommendation, Cutler would not have been fired. *Id.*  Pattillo "simply accepted the recommendation … Based on whatever factors he [Berry] had discussed in his investigation or however he came to his conclusion, that's what I accepted." *Id.* at p. 74, l. 8-20.  Pattillo didn't scrutinize Berry's reasons or have his own. *Id.*  Pattillo has never rejected a termination recommendation from Berry. *Id.* at pp. 84, l. 25 to 85, l. 18.  Pattillo also testified that nothing would have prevented Berry from recommending Cutler's termination for political reasons or to please Pattillo, the Board of Regents, or Rep. Gohmert. *Id.* at pp. 121, l. 21 to 122, l. 7.

Defendants contend that Berry's recommendation to terminate Cutler was based on Gohmert's letter and Defendant Robinson's account of Cutler's response to the letter, and Berry's resulting conclusion that Cutler had lost an opportunity to host Rep. Gohmert's high school art contest.  Motion at p. 11.  Berry testified that he made his decision because of Cutler "blowing it on the art show," which was a culmination of three other events that all exemplified arrogance and self-centeredness;  Cutler allegedly wanted to park without paying tickets; Cutler allegedly thought he "knew" better about funding the art gallery; and Cutler allegedly didn't want a long account number. *Plaintiff's Exhibit 14*, Berry III depo at pp. 32, l. 22 to 33, l. 24.

In fact, the parking incident was over a year earlier, had only been informally mentioned to Berry, Berry described it only as a "loud disagreement," and at the time no action was necessary.  *Exhibit 13*, Berry II depo at p. 22, l. 1-8; pp. 25, l. 11 to 26, l. 7. Defendant Robinson, Cutler's direct supervisor, testified about the parking matter this way:  Cutler had brought it to his attention and Robinson got him a special parking pass because, due to the nature of Cutler's job, Cutler had to be at different locations.  *Exhibit 6*, Robinson depo at pp. 29, l. 1 to 30, l. 15.  Cutler was not disciplined.

The funding matter had occurred almost three years earlier, was not documented, had not been deemed important until after Rep. Gohmert's letter, and could barely be described by Berry.  *Exhibit 13*, Berry II depo at pp. 11, l. 3 to 14, l. 5.  Cutler was apparently unhappy that naming rights for the main gallery space had been undersold for much less than had been expected,  and he had counted on the full amount to operate the gallery.  *Id.*  Berry could give no objective description or details about what Cutler allegedly did wrong, except that somebody was unhappy with Cutler's "manner of delivery," "tone" and "choice of words."  *Id.*

The supposed account number matter came to Berry's attention <u>after</u> Rep. Gohmert's letter, when they began to investigate Cutler's work record.  *Exhibit 13*, Berry II depo at pp. 36, l. 24 to 39, l. 5.  Somebody had mentioned it conversationally, in passing and Berry didn't go ask about it under *after* Cutler had been fired.  *Id.*

Berry admitted that nobody ever made sure that Cutler was talked to about any of these matters, which is not normal at SFA.  *Id.* at p. 36, l. 2-16.  Normally such things are supposed to be in an employee's evaluations.  *Id.*

H.  Cutler's Speech Did Not Disrupt SFA

Defendant Himes, the Dean of the College of Fine Arts, testified that regarding the whole situation he was disappointed, not in Cutler or because of any disruption or lost efficiencies, but because "we had lost an opportunity for a connection with an elected office."  *Exhibit 15*, Himes II depo at p. 11, l. 6-13.  He also clarified that, regardless of whose version of the events was considered, the only disruption was a perceived lost opportunity to have a connection with an elected official, and that there was no disruption of the SFA art galleries or the College of Fine Arts.  *Id.* at pp. 33, l. 25 to 37, l. 1.  Defendant Berry similarly described the issue as "we wanted to remain on good terms with Congressman Gohmert."  *Exhibit 14*, Berry III depo at pp. 25, l. 5 to 26, l. 18.

**V**
**Legal Standard for Summary Judgment**

The Court should grant a motion for summary judgment if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986); Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship, 520 F.3d 409, 411 (5th Cir. 2008).  A fact is material if it might affect the outcome of the suit under the governing law.  Sossamon v. Lone Star State of Tex., 560 F.3d 316, 326 (5th Cir. 2009).  Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Sossamon, 560 F.3d at 326.  When ruling on a motion for summary judgment, the Court must view all inferences drawn from the factual record in the light most favorable to the nonmoving

party.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986); Sossamon,

560 F.3d at 326.

Under Rule 56, the party moving for summary judgment must "demonstrate the

absence of a genuine issue of material fact."  Duffie v. United States, 600 F.3d 362, 371

(5th Cir. 2010) (internal quotation omitted).  If the moving party fails to meet this initial

burden, the motion must be denied regardless of the nonmovant's response.  Id. (internal

quotation omitted).  If the movant meets the burden, however, Rule 56 requires the

opposing party to go beyond the pleadings and show by affidavits, depositions, answers

to interrogatories, admissions on file, or other admissible evidence that specific facts exist

over which there is a genuine issue for trial.  Anderson, 477 U.S. at 250; U.S. ex rel.

Farmer v. City of Hous., 523 F.3d 333, 337 (5th Cir. 2008); EEOC v. Tex. Instruments,

Inc., 100 F.3d 1173, 1180 (5th Cir. 1996).

An authoritative summary judgment decision dealing with many aspects of free

speech in the context of public employment is Kinney v. Weaver, 367 F.3d 337 (5th Cir.

2004) (en banc).  Rankin v. McPherson, 483 U.S. 378 (1987), also authoritatively applies

free speech law in the public employment context.

## VI
## Sufficient Evidence Exists to Hold Defendants Himes and Robinson Liable

Defendants argue that Himes and Robinson cannot be held liable because they are

not "final decision makers," citing DePree v. Saunders, 588 F.3d 282, 288 (5th Cir. 2005).

Motion at p. 13.  In fact that case recognizes that others can be held liable if they possess

leverage or exert influence over the decision, which Defendants deny.  Id., 588 F.3d at

288-89; Defendants' Motion at p. 14.  Defendants provide no supporting analysis.

The evidence establishes more than enough evidence for the fact finder to determine that both Himes and Robinson exercised considerable leverage and influence over the decision.  *See* Sections IV-F and G, above.

Defendants Robinson and Himes were both at the September 21, 2010 meeting in which Robinson reported his version of Cutler's response to Gohmert's letter, supposedly leaving Berry with the impression that Cutler had known he was declining an opportunity for SFA to host Rep. Gohmert's high school art contest.  *See* Section IV(f), *supra*.  It was during this meeting that both Himes and Robinson discussed an alleged series of interpersonal problems that Berry also claimed to rely on in terminating Cutler.  Both Himes and Robinson apparently stuck to only the negative during this meeting, trying to put Cutler in a bad light, and not mentioning Cutler's stellar performance.  *Id.*  Both Pattillo and Berry have testified that they relied heavily on both Himes' and Robinson's opinions, advice and "investigation" to reach the decision to fire Cutler.  *Id.*

The evidence of Robinson's and Himes' influence and leverage is quite overwhelming, and Defendants' Motion makes no effort to demonstrate the absence of such evidence.  There is more than sufficient evidence to conclude that both Defendants Robinson's and Himes' roles leave them liable for the retaliatory termination of Cutler.

## VII
## Sufficient Evidence Exists to Establish that
## Cutler's Discharge Violated the First Amendment

Defendants contend only that there is insufficient evidence to show that (1) Cutler's speech involved a matter of public concern, and (2) Cutler's interest in commenting on the matter of public concern outweighed the Defendants' interest in promoting efficiency.  Motion at pp. 14-15.  Defendants' Motion concedes that Cutler

suffered an adverse employment action and that his speech was a substantial or

motivating factor behind the adverse action.  *Id.  See also* <u>Kinney v. Weaver</u>, 367 F.3d at

356.

A.   <u>The Evidence Shows that Cutler Was Acting as a Citizen Speaking His Opinion
and Declining to Jury a High School Art Show, and that Defendants Were Being
Unreasonable and Did Not Really Believe Otherwise</u>

The first question in deciding if Cutler's speech is protected is whether he was

speaking as a citizen or as an employee of SFA.  <u>Davis v. McKinny</u>, 518 F.3d 304, 312

(5th Cir. 2008), citing <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006).  In this case Defendants

assume that this is a determinative issue.  Defendants further argue that they get to decide

what the underlying facts are, "regardless of what really happened."  While an

employer's view of the facts is entitled to some deference, that is so only when the

employer is being *reasonable*  in their belief in their chosen version of the facts and if the

employer "really" believed their chosen version of the facts.  <u>Waters v. Churchill</u>, 511

U.S. 661, 677, 679-80 (1994).

Here, Defendants make no attempt to demonstrate reasonableness or to counter

the considerable evidence that they were really unconcerned about what had happened.

First, they disregarded Cutler's stellar performance and mischaracterized his work

history, putting inordinate effort in seeking negative information to use against him.  *See*

Sections III and IV-D.  Defendants did not ask Cutler about the discrepancy between his

actual description and what Robinson had reported, they rebuffed and ignored Cutler's

efforts to explain.  *See* Section IV-E.  Himes said that whether Cutler had declined the

opportunity to jury Rep. Gohmert's art contest and there had been no mention of SFA

hosting it, "I don't think that's an issue."  *Id.*  Himes also agreed that Cutler was being

railroaded and that there really was not an investigation. *Id.* Defendant Berry plainly indicated that Cutler's role was not important – it was SFA's relationship with the Congressman "who helps us get funding for things." *Id.* It is also telling that Defendants Robinson and Himes, after Cutler had been fired, interpreted a friendly call from Rep. Gohmert's office as "affirmation" of their decision to terminate Cutler. *Plaintiff's Exhibit 16*, email of October 13, 2010.

There is sufficient evidence for the fact finder to conclude that the Defendnts did not really believe that Rep. Gohmert had asked SFA to host his art show, and certainly enough to conclude that the Defendants were being unreasonable, as opposed to acting neutrally or in good faith, in disregarding Cutler's attempts to be head. This, and other, evidence certainly should permit the fact finder to withhold deference to the Defendants' claimed view of the facts, and to conclude that Cutler was acting as a citizen when he declined to jury Rep. Gohmert's art show in Tyler.

B. Cutler's Speech was on a Matter of Public Concern

The second step in the analysis is whether the speech was on a matter of public concern. Davis, 518 F.3d at 312.

The evidence shows that Cutler's speech, which Defendants concede to have been a substantial or motivating factor behind his termination, was well within the category of speech involving a matter of public concern. Cutler said he did not want to associate with Rep. Gohmert because he was of the opinion that the Congressman was a fear monger and sensationalist. *See* Section IV-A, *supra*.

In Rankin v. McPherson, 483 U.S. at 387, the Supreme Court reiterated the extent of protected speech on matters of public concern:

"[D]ebate on public issues should be uninhibited, robust, and wide-open, and … may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (citing) New York Times Co. V. Sullivan, 376 U.S. 254, 270; 84 S.C. 710, 721; 11 L.Ed.2d 686 (1964).

It should also be noted that Defendants Pattillo, Berry and Robinson all testified that Cutler's speech was protected as free speech.  *See* Sec. IV-A, *supra*.  Given the broad scope of speech on matters of public concern that the courts have deemed to be protected by the First Amendment, and the testimony of most of the Defendants, Cutler's speech at issue here is speech on matters of public concern.

C.   The Balancing Test:  Cutler's Interest in His Speech Outweighs the Defendants' Interest in Efficiency

The third step of the analysis is to balance Cutler's interest in free speech with the Defendants' interest in efficiency, from Pickering v. Bd. of Ed., 391 U.S. 563, 568 (1968).  *See* Davis, 518 F.3d at 312.

The value of Cutler's speech is measured by its social function, not by some tangible benefit to Cutler.  Kinney, 367 F.3d at 361.  Speech concerning public affairs represent an extremely strong First Amendment interest.  *Id.*  Therefore Plaintiff contends that his interest here is extremely strong.

Defendants, on the other hand, present no relevant interest in efficiency.  The question is not some abstract value, but how the speech at issue affects the government's interest in providing services effectively:  did it actually impair the employer's operations?  *Id.,* 367 F.3d at 362.  When Defendant Himes was asked he said it did not.  *See* Sec. IV-H, *supra*.

Cutler's free speech interests clearly outweigh the Defendants' interests, because the evidence indicates they have none.

## VIII
## Defendants Himes and Robinson Are Not Entitled to Qualified Immunity

When considering this issue on summary judgment it is important to be aware that a decision concluding that there are factual disputes is not subject to an interlocutory appeal, while a summary judgment decision based on a question of law is.  Kinney, 367 F.3d at 346-47.  The Defendants in this case have already demonstrated a propensity for interlocutory appeals; *see* Dkt. 39.

Here, it has long been well-established that public employees cannot be subject to retaliation for an exercise of free speech, and Defendants do not argue otherwise.  *See*, for instance, Kinney, 367 F.3d at 367, and cases cited therein.

Instead, Defendants argue that Defendants were being reasonable in relying on their discretion to choose (they say "decide") which version of disputed facts to credit.  Motion at p. 23.  In doing so Defendants exaggerate their discretion by overlooking that it had to be reasonable and unbiased.  Particularly in light of the Defendants' many statements and actions indicates that their motives were in fact political, the evidence demonstrates that their conduct was unreasonable under the controlling law.  *See* Sec. VII-A, *supra*.

## IX
## Conclusion

FOR THESE REASONS Plaintiff requests that Defendants' Motion be, in all things, DENIED.

Respectfully submitted,

/s/ *TIMOTHY B. GARRIGAN*
Timothy B. Garrigan
Bar Card No. 07703600
Attorney for Plaintiff Cutler

Stuckey Garrigan & Castetter Law Offices
2803 North Street; P.O. Box 631902
Nacogdoches TX 75963-1902
(936) 560-6020/FAX: (936) 560-9578
tim@sgclaw.org

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served all parties of record in this case including the following with a true and correct copy of the foregoing Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Dkt. 49) by sending same via **electronic filing**/FAX/hand delivery/U. S. mail, postage prepaid:

James C. Todd, Assistant Attorney General
Office of the Attorney General, General Litigation Division-019
P O Box 12548, Capitol Station
Austin TX  78711-2548

on this the 14th day of February, 2013.

/S/ *TIMOTHY B. GARRIGAN*
_____
Timothy B. Garrigan