Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

CHRISTIAN CUTLER,            )
                             )
        PLAINTIFF            )
                             )
VS.                          )
                             ) CIVIL ACTION
STEPHEN F. AUSTIN STATE      )
UNIVERSITY PRESIDENT         ) NO. 2:11cv447
BAKER PATTILLO, sued in      )
his individual and           )
official capacities, et      )
al,                          )
        DEFENDANTS           )
                             )

---

ORAL DEPOSITION OF

SCOTT ROBINSON

DECEMBER 5, 2012

---

ORAL DEPOSITION OF SCOTT ROBINSON, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on the 5th day of December 2012, from 8:59 a.m. to 1:53 p.m., before LEAH HALE, CSR in and for the State of Texas, reported by machine shorthand, at the Law Offices of Stuckey, Garrigan & Castetter, 2803 North Street, Suite C, Nacogdoches, Nacogdoches County, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.


PLAINTIFF'S EXHIBIT 6
2:11 cv 447

SCOTT ROBINSON

1  A. I think he had made me aware of his frustration
2  with getting parking tickets due to the nature of his
3  job having to be at different locations, which I
4  understood.
5  Q. Okay.
6  A. And I pursued getting a special parking pass
7  for him that would allow him to park in loading areas,
8  for instance.
9  Q. Did that resolve the problem?
10 A. I don't recall. I'm sure it did at least for
11 the short-term.
12 Q. How many times was this concern brought to your
13 attention?
14 A. I don't recall.
15 Q. Was it just once?
16 A. Well, the parking issue was ongoing for
17 Christian as far as I recall.
18 Q. All right.
19 A. That's the multitude of parking tickets.
20 Q. So there were several parking tickets?
21 A. I think so.
22 Q. I take it Christian didn't think he should have
23 to pay them?
24 A. I don't recall.
25 Q. Do you know whether or not he had to pay the

1 tickets ultimately?

2 A. I don't recall. I believe I personally made a
3 phone call to take care of one of them with staff in the
4 police department, but I can't say for sure.

5 Q. Was Christian being unreasonable in thinking
6 that he should be able to park more liberally than most
7 people because of his job?

8 A. I think he needed a different type of access
9 than most staff, and I concurred on that point.

10 Q. Did you in any way discipline Cutler for either
11 of these concerns: the bursar's office or the police
12 parking ticket matter?

13 A. Not that I recall.

14 Q. Did you ever discipline Cutler?

15 A. I don't think I did.

16 Q. Did you ever document any criticisms of Cutler?

17 A. Other than his need for more patience with red
18 tape and working through the State system and utilizing
19 me, his boss, more rather than trying to take care of
20 things himself.

21 Those were the types of advice that I gave
22 him in our counsel, as well as, I believe, in his
23 evaluations.

24 Q. I'm sorry. Would you summarize those again?

25 A. I asked him to be more patient and to work

SCOTT ROBINSON

c07d856d-70bd-4768-b48b-1f9e67b7e4e0

1  through his supervisor more to allow me to help move
2  things along.
3      Q.  Okay.  Any other categories of criticism other
4  than those two?
5      A.  I can't recall at the moment.
6      Q.  Do you remember getting a call, I think, from
7  either Richard Berry or Buddy Himes about a letter from
8  Congressman Gohmert?
9      A.  The night that Dr. Himes asked me to call
10 Christian about the letter was the first I was made
11 aware that such a letter existed.
12     Q.  Do you know what date that phone call took
13 place?
14     A.  I have no idea.  I do not recall.
15     Q.  Okay.  Well, let's just call that the call
16 about Gohmert's letter.
17     A.  Yes.
18     Q.  Before that, before you got that call -- and
19 you say you got it in the evening?
20     A.  Yes.
21     Q.  Had you already left the office?
22     A.  I had.
23     Q.  And before that, when you left the office that
24 day, if you were going to give Christian Cutler a grade
25 for his performance on a hundred point scale, what would

1  story.

2  Q. (BY MR. GARRIGAN) I need to object. You're
3  being nonresponsive.

4  A. Okay.

5  Q. What made you think this phone call to Cutler
6  was going to be important?

7  A. Well, obviously, it was important because Himes
8  was calling me at home and asking me to do this.

9  Q. Had you received other phone calls like that
10 from Himes?

11 A. Perhaps. I can't recall, but quite possibly
12 for issues of safety or other things that might come up.

13 Q. Can you think of one other time that Himes
14 called you at home with a request that you deem
15 comparable to this one about calling Cutler?

16 A. Not at the moment, no.

17 Q. Did Dean Himes indicate that he was unhappy
18 with Cutler?

19 A. It was clear he was unhappy about the letter,
20 yes.

21 Q. How did he express his unhappiness about the
22 letter?

23 A. By calling me and asking me to get Christian's
24 side of the story.

25 Q. I guess, was it his tone that conveyed the

SCOTT ROBINSON

c07d856d-70bd-4768-b48b-1f9e67b7e4e0

1  importance and unhappiness? What was it that conveyed
2  that to you?
3     A.  As you know, a large percentage of all
4  communication is nonverbal. So it would probably be a
5  safe assumption that the tone was indicative of gravity.
6     Q.  So how would you describe Dean Himes' tone?
7     A.  That I need to do this pronto.
8     Q.  I need you to describe his tone, not your
9  interpretation of what he was saying but --
10    A.  Tone is interpretative. I was called at home
11 and asked to do this tonight, if possible, as soon as
12 possible.
13    Q.  So there was some urgency to it?
14    A.  I would say yes.
15    Q.  Was he more direct and to the point than Dean
16 Himes normally is?
17    A.  I can't say.
18    Q.  Is there anything else you can tell us about
19 that conversation with Himes?
20    A.  Not at the moment, I don't recall anything
21 additionally.
22    Q.  During that conversation, did Dean Himes in any
23 way indicate that he was unhappy with Cutler?
24    A.  It was clear he was unhappy about the letter.
25 That's all I can say.

SCOTT ROBINSON

c07d856d-70bd-4768-b48b-1f9e67b7e4e0

1    Q. Had you heard him be similarly unhappy about
2    other matters?
3    A. Specifically concerning whom?
4    Q. Anybody.
5    A. Absolutely. It's the nature of being a manager
6    like we had discussed earlier in our conversation today.
7    You often have to field comments and concerns from
8    various sources about people under your charge. We're
9    all human.
10   Q. Okay. When had he -- had there been occasions
11   when he similarly approached you about other matters?
12   A. Concerning?
13   Q. Anything.
14   A. Sure.
15   Q. I'm talking about his approach and his tone.
16   A. It's the nature of the chain of command, being
17   administrators. I would say yes.
18   Q. Usually when he would use that approach and
19   tone, did that mean he expected action to be taken?
20   A. Depends on the situation, but quite likely.
21   That would be the purpose of having the discussion.
22   Q. Okay. Did you have any idea that Cutler's job
23   was on the line at that point?
24   A. I couldn't say at that moment. I knew that it
25   was serious, as I said, because of the phone call and

SCOTT ROBINSON

c07d856d-70bd-4768-b48b-1f9e67b7e4e0

1  the witness changes the question and tries to answer a
2  different question, it just sends up a red flag. And
3  it's clear to me that you're trying not to answer the
4  question that I've asked you.
5           MR. TODD:  Objection, form.
6      Q.  (BY MR. GARRIGAN)  My question, I think, is
7  very simple.  As a result of your conversation with Dean
8  Himes, did it occur to you that Christian Cutler's job
9  might be on the line?
10     A.  Might be?
11     Q.  Might be.
12     A.  As a possibility, yes.
13     Q.  Okay.
14     A.  Depending upon how it played out.
15     Q.  Let's go into this a little further.  Did I ask
16 you how it might play out?
17     A.  I inferred it from the question.  I'm sorry if
18 I wasn't supposed to do that.  I apologize.
19     Q.  Let me try asking it again.
20     A.  Okay.
21     Q.  I'd like a good, clean answer on this if it's
22 possible.  I want it to be accurate, but I don't want
23 you to try to answer a question that I haven't asked
24 you, okay.
25          As a result of the phone call from Dean

Page 43

1  Himes where he first mentioned Gohmert's letter, did it
2  occur to you that Christian Cutler's job might be on the
3  line?
4      A. Possibly. It was a possibility, yes. It
5  occurred to me it was a possibility.
6      Q. Okay.
7      A. That's the most honest answer I can give you.
8      Q. Okay. Prior to that moment, had you
9  considered -- had anything suggested to you that
10 Christian Cutler's job had been on the line?
11     A. No, not as his supervisor, no.
12     Q. For any reason. No?
13     A. Before that moment that we're speaking of?
14     Q. Yes.
15     A. No.
16     Q. All right. So you say your conversation with
17 Himes was very brief?
18     A. I think so.
19     Q. Seconds or minutes?
20     A. I don't recall.
21     Q. Give me your best estimate of how long it was.
22         MR. TODD: Objection, form.
23     A. I cannot recall.
24     Q. (BY MR. GARRIGAN) Okay. Can you recall how
25 long the phone call was?

SCOTT ROBINSON

1  Q. So it's fair to say Cutler was concerned about
2  this matter too? Was that your impression?
3  A. My impression was that Mr. Cutler was angry
4  about the letter.
5  Q. Okay. What other impressions did you gather
6  from Mr. Cutler's tone and demeanor?
7  A. That he was angry, and he was upset, and he --
8  as he states in the notes, he feels like Congressman
9  Gohmert was using his office to throw his weight around
10 as a -- what were the words -- "fear tactic?"
11 Q. Well, tell me everything you can about the
12 phone call, using your notes to refresh your
13 recollection. Again, we're talking about SFA38 and 39.
14 A. Correct. I call, leave a message for Christian
15 to call me back. He does so pretty quickly. As you see
16 in the notes, he says "boo hoo or you hoo. I know what
17 you called about."
18         And where it says "full story:", it's not
19 in quotation marks. I take that to mean that I was
20 asking him for the full story. And then the rest
21 proceeds his story. I only use quotation marks when I
22 feel like I'm getting a verbatim record of what is being
23 said.
24         So following through, this is my notes
25 showing the full story from Christian. And then it ends

SCOTT ROBINSON

1  termination was in the picture?

2      A. Is this the same question as before?

3      Q. No.

4      A. I mean, nothing has changed from the time that

5  I completed the phone call to the time that I went to

6  this meeting the next morning.

7          So originally you had asked me about is it

8  a possibility, and I inferred the entire range of

9  possible outcomes. So you're asking now again --

10     Q. Two different questions. When you walked into

11 Dean Himes' office, were you aware of any reason that

12 Cutler should be terminated?

13     A. I hadn't decided that he should be terminated,

14 no.

15     Q. Were you aware of any reason that suggested he

16 should be terminated?

17     A. Not unless more information comes to light.

18 The investigation had just started, to that question.

19     Q. So my guess, then, is -- and this is just a

20 guess because this isn't going as quickly as it should

21 -- that when you walked into Dean Himes' office, you

22 were not aware of any reason that Cutler should be

23 terminated?

24     A. A lot of questions remained unanswered, so I

25 would have to say that that had not been determined. So

1  that means no.
2  Q. I don't think it does, not the way you're
3  saying it. I'll give you a chance to explain this if
4  you want to.
5  A. Okay.
6  Q. But I'm asking you a question that I think
7  calls for a yes or no answer. When you walked into Dean
8  Himes' office on the morning of September 21st, were you
9  aware of any reason that would suggest that Christian
10 Cutler should be terminated?
11 A. Personally or institutionally? Am I speaking
12 of my personal opinion?
13 Q. Yes.
14 A. I wasn't asked to make that call; however, I
15 would say no at this point in time.
16 Q. Nobody ever asked you that?
17 A. Termination?
18 Q. Yes.
19 A. No.
20 Q. And institutionally, were you aware of any
21 reason for Cutler to be terminated when you walked into
22 Dean Himes' office on the morning of September 21st,
23 2010?
24 A. I think this was the time at which that
25 question was being raised and was going to be answered.

1  The wheels were in motion to answer that question.
2      Q. Given what you knew --
3      A. At this point.
4      Q. -- at this point, when you walked into Dean
5  Himes' office, were you aware of any institutional
6  reason that Cutler should be terminated?
7      A. I don't know.
8      Q. You don't know if you were aware of anything?
9      A. I'm uncomfortable making that call because it
10 was not my call to make.
11     Q. Okay. I'm not asking about your comfort level,
12 okay. And I need to object that you've been
13 nonresponsive.
14         When you walked into Dean Himes' office on
15 the morning of September 21st, 2010, were you aware of
16 any institutional reason that Cutler should be
17 terminated?
18     A. Institutionally, I could see that they might
19 want to proceed with firing him for this incident, yes.
20     Q. I understand this is your opinion. Why do you
21 think that would come to pass? What do you think that
22 reason would be?
23     A. Well, obviously, everyone from the president to
24 the provost to the dean has been brought into this, so
25 it would be logical that a serious outcome was possible.

SCOTT ROBINSON

c07d856d-70bd-4768-b48b-1f9e67b7e4e0

Page 75

1  Q. Okay. Other than the actors involved, is there
2  anything that you learned from Christian Cutler --
3  A. From my conversation?
4  Q. Yes.
5  A. No.
6  Q. -- that suggested an institutional or personal
7  reason --
8  A. Well, I can't speak for the institution. But
9  personally -- if you want to know personally what I
10 would do based on this conversation?
11 Q. Sure, answer that.
12 A. No, not yet.
13 Q. You don't see any reason -- there was no reason
14 at that point to fire him?
15 A. Not yet. It would be too soon to make that
16 call.
17 Q. Okay. Now, who was at that meeting on the
18 morning of the 21st?
19 A. It was myself, Dean Himes and Dr. Berry.
20 Q. It was in Dean Himes' office?
21 A. Correct.
22 Q. All right. Tell me everything you can remember
23 about the meeting.
24 A. They asked me to report on what I learned, and
25 my impression was they were hoping for reconciliation.

SCOTT ROBINSON

c07d856d-70bd-4768-b48b-1f9e67b7e4e0

1  Q. Understand I'm not asking you what you're
2  thinking, okay. I'm not asking you what you were
3  thinking at the time or what you're thinking right now.
4        I'm asking you: How did the conversation
5  come around to discussing this alleged series of
6  interpersonal problems with Cutler?
7  A. It came about because the administration was
8  trying to figure out what to do in response to the
9  current situation.
10  Q. By the "administration," who do you mean?
11  A. That means my bosses: Dr. Himes and Dr. Berry.
12  Q. Is that what they told you then: We're trying
13  to figure out a positive resolution of this matter?
14  A. I don't think it was explicitly said. But,
15  yes, I understood that that was the purpose of the
16  meeting, to try to find a resolution to what has
17  confronted the University.
18  Q. And by that, you mean --
19  A. The letter.
20  Q. -- Cutler's interaction with Gohmert's office
21  and the letter?
22  A. Yes.
23  Q. Is that correct?
24  A. Correct.
25  Q. Who brought up the subject of Cutler's history

SCOTT ROBINSON

c07d856d-70bd-4768-b48b-1f9e67b7e4e0

1  minute ago, were you?
2          MR. TODD: Objection, form.
3      A. You helped me out a little bit, I do believe.
4  I can't say that for sure, but I would think that they
5  would have asked me about his performance reviews.
6      Q. (BY MR. GARRIGAN) Sounds like you're
7  speculating?
8      A. I am.
9      Q. Okay. I'm not asking you to speculate.
10     A. Then I can't -- then my answer is the same.
11     Q. Was there any discussion of the positive
12 aspects of Cutler's job performance?
13     A. I can't recall.
14     Q. You can't recall any such discussion?
15     A. I can't recall definitely that any such
16 discussion occurred.
17     Q. Okay. The question that you answered no to --
18 which you can't remember, correct? You can't remember
19 if asked about rehabilitation or what the terms were?
20     A. I'm not sure what your question is.
21     Q. Can you remember what -- you said there was one
22 question you were asked and that you answered during the
23 meeting with Himes and Berry on the 21st, and your
24 answer was "no," correct?
25     A. I believe so.

SCOTT ROBINSON

1   Q. And you don't remember whether the question
2   actually involved the term "rehabilitation," but you
3   took it to be -- the question that you were answering no
4   to without remembering what was asked was whether you
5   thought Christian was capable of making some sort of
6   softer response to Gohmert's letter; is that right?
7   A. Within the context of this information I was
8   bringing to the meeting, correct.
9   Q. According to Berry's notes, you answered the
10  question not just "no," but "It will continue to
11  happen?"
12  A. I don't recall.
13  Q. This thing with Gohmert is a single incident,
14  isn't it?
15  A. It was an ongoing incident.
16  Q. How was it an ongoing incident?
17  A. Because I would assume that something needed to
18  happen, vis-a-vis president being in reception of the
19  letter -- in receipt of the letter.
20  Q. Now, at the point you were answering that
21  question, your answer was basically that you didn't
22  think Cutler's opinions of Gohmert could be changed; is
23  that right?
24  A. I agree.
25  Q. And certainly his impressions of a congressman

SCOTT ROBINSON

c07d856d-70bd-4768-b48b-1f9e67b7e4e0

1 are a matter of free speech. Don't you agree?

2         MR. TODD: Objection, form.

3         But go ahead.

4     A. I'm not a lawyer, but I would say yes, in my

5 personal opinion.

6     Q. (BY MR. GARRIGAN) Okay. And it's your

7 interpretation that essentially Himes and/or Berry were

8 asking you whether Cutler's opinions of Gohmert could be

9 changed; is that right?

10     A. I think that was my interpretation.

11     Q. Now, other than the fact that Christian has

12 this dim view of Gohmert, had there been any other

13 series of events, problems, issues, whatever you want to

14 call it, that in any way are similar to this?

15     A. No. At the level of a congressman was

16 involved, no.

17     Q. I don't know what the level of a congressman

18 has to do with it. But take that qualification out

19 because I didn't ask you about that.

20     A. Okay. So the question again is?

21     Q. Are there any events that you think are in some

22 way comparable to Christian's -- the way he voiced his

23 opinions about the congressman in this case?

24     A. His opinion voicing? Other than -- the one

25 that I can recall is the police department.